Mr. Shapiro, hold on one second. Go ahead.  My name is Alexandra Shapiro, and I represent Appellant Mark Johnson. This case is unprecedented. It's an attempt by the Department of Justice to deprive Mark Johnson of his liberty for conduct that would not even survive a motion to dismiss in a civil case. The transaction at issue was between two sophisticated arms-length counterparties, and it was of a type that the U.S. regulatory agencies have deliberately chosen not to regulate, as the SEC filed the complaint, a parallel civil complaint in this case? This market is not regulated by the SEC or the CFTC or any other federal agency. It would be the CFTC, that's right. That's right. And they only regulate, as pertaining to this, transactions with retail customers. So there's basically no law, regulation, or even industry norm that was violated here. And the terms of the bargain between these two counterparties were set forth in a contract that Cairn, the alleged victim, insisted on and had its advisers draft and was approved by its lawyers. Isn't what is going on here that your clients decided that they would not do, together with the other side, a fixed fee, and that they would do something else? And that then your client, against what they had agreed with the others, did, ramping in, to some extent, not as much as would have been paid had there been a fixed fee, but in violation of what the agreement was. And that you guys thought it was okay because you weren't charging them as much as they would have had they had something else, but that you actually did, violated exactly what you had said that you would do. Absolutely not, Your Honor. The terms of this transaction were set forth in the contract. And the background here is that HSBC was not acting in any way on behalf of Cairn. And Cairn well understood that the way HSBC would make money, if it chose a fix, which HSBC didn't even know for sure until the 11th hour when the order was placed, that there were two ways a fix could be done, sorry, two ways the transaction could be done. It could have been done multiple other ways, but these were the two ways that Cairn considered. And one was what was called a full risk transfer. And that would be one where the parties would, Cairn would place the order, they would add a certain number of, fixed number of points to it. And for its own reasons, Cairn chose not to do that. There were two reasons. One, it's a public company and it wanted to be able to point to a published price and get transparency. So it chooses a fixing transaction. Correct. And also they thought it would be less expensive, and indeed it was. My question is, the whole, Cairn's whole purpose was to avoid people finding out about this deal precisely so what happened didn't happen. So they didn't want people ramping right before the 3 o'clock fix price. So that was the whole reason for the confidentiality agreement. And then it seems that your client did precisely what it was they didn't want to do. There are all these HSBC people trading ahead of the fix and it ramped up the price. That's not correct, Your Honor. And I think, respectfully, part of the problem here is that the government has thrown up a lot of misleading impressions about the actual facts. So I'm just going to take one minute to explain this. The contract says what it says. It disclaims any duty. What the NDA, the confidentiality provision, which, by the way, Mr. Johnson never saw, but in any event, the purpose of it was to prevent the information, the timing from getting out to other banks. It is undisputed. It was never leaked to any other banks. What happened was, and by the way, the government complains that a lot, most of the pounds were If the usual rules with respect to insider trading were to apply, and that's a question, of course, as to whether they would apply here, the fact that there wasn't a leak to others but that it was used to trade on their own account would be a violation. So if that applies, that applies as much here as there. Your Honor, I'm sorry, but I really need to set the, I think a misimpression has been created on the facts and I'd like to first finish answering Judge Donnelly's question and then I think you'll see why that's not precisely relevant here. So what happened was, first of all, all of these accounts are accounts of the bank and there is no substantive difference from the bank's perspective between a proprietary account and a franchise book. And moreover, when there are transactions between these different internal accounts, those do not affect the market. So during the course of the RFP, if HSBC, if Mr. Johnson or others had used the confidential information to benefit their own proprietary accounts, that would not have been okay. First of all, that didn't happen. No, I understand that, but you're, I think you're taking us down a road. Well, I want the court to- Where if the confidential information is used for HSBC's benefit, generally speaking, that's okay. Is that what you're arguing? That's not what happened, but I think you have to understand the- When you keep saying that's not what happened, remember we are dealing with a jury verdict. I understand, Your Honor, but I think there's a misimpression here. So let me just say something. These proprietary accounts, the franchise accounts, they're indistinguishable. The government's expert said that they make, it makes no difference. They're all for the bank's account. And this is a bank that trades billions of dollars of foreign currency every day. They're trading pounds every day. So on the theory that is being propounded here, for two months, this giant bank couldn't trade in pounds. This man was the head of- The question is whether they traded in a way that violated the NDA, whether they did things which violated the specific contract with this particular person. No one is saying, and the amicus briefs worry about that correctly, no one is saying that banks can't trade ahead of time. No one is saying that banks can't do hedging in. No one is saying that they can't do ramping in and the appropriate thing. The question is, in this particular context, the allegations are made that there were agreements that this would not be done. And there weren't. So that's the first point. This NDA- And how do we know that? Or is that a question of fact that we are bound to uphold if there is, and I'm not saying that there is, if there is enough evidence for a jury, so to find? We know that because we look at the contracts. And the language of the contracts is clear. This NDA- Tell me about that. The language of the contracts- Okay. So I want to make two different points. First of all, with respect to this NDA, the purpose of the NDA and what it says is that you can only use the information for the purpose of analyzing the transaction in connection with the RFP. It does not address the execution of any transaction, and indeed, nor could it because in this context, if you choose this type of transaction, the bank has to- Was there not testimony that directly contradicts what you're saying? That is, testimony, including from people at HSBC, that strongly suggested, at the very least, that the confidentiality provision extended beyond the RFP and into the actual transaction itself. Now, this is a contract that needs to be viewed by the words of the contract. It was also expressly superseded with respect to the execution by the mandate letter- First answer my question. So you may be right, you may be wrong, but was there not testimony from people at HSBC that they understood that the confidentiality restrictions applied even after the RFP period? The only person from HSBC who actually was familiar with this NDA, and by the way, Mark Johnson never read the NDA. There's no evidence he ever saw it, but Mr. Cott testified that he knew when the trades were placed, he testified that he didn't believe he had done anything wrong and that he didn't believe the bank had done anything wrong. But he did testify that he understood the confidentiality provision extended beyond the RFP. Extended beyond the RFP. I don't remember whether he specifically said that, but everyone understood, and Cairn testified that the purpose of the confidentiality agreement was to ensure that other banks didn't get the information, and that he didn't care how many people HSBC used to trade, it could be one, it could be 15, that was up to them. And moreover, and this is absolutely critical and I understand your honors are resisting it, but this transaction was not a transaction in which HSBC was acting on behalf of Cairn. They were arm's length counterparties. Cairn insisted that the terms be put in the mandate letter, which contains the only obligations and critically, itself and in the incorporated ISDA that Cairn insisted be in there, disclaims any fiduciary advisory six ways to Sunday. Any fiduciary duty, okay, but the statute deals about fiduciary duties and other relationships of similar sort. There's no claim that a fiduciary duty, that was discounted. But is there, the key thing is was there an agreement that these people, that your clients would not ramp in to raise the price in order to make money, rather than just be buying pounds, dollars, at what was going on, and that were they using it? As the testimony said, we're doing this, we don't want to go too far because we don't want the other side to get mad, but so long as they're getting a better deal than they would have gotten on the exact fix, they're not going to complain, even though we're violating what the agreement was. That's the claim that the government is making, and that's the claim the jury seems to have bought. Your Honor, if I could respond, I think there's a lot packed into that. I'm not sure it's a question, but I have a couple of important responses. First of all, with respect to the first part of your point about fiduciary duty, the case, first of all, there's nothing in the statute about fiduciary or otherwise. The case law is very clear that it has to be a duty of trust and confidence, and that that entails domination, control, and reliance, among other things. That's what this jury was instructed, the government agreed to it. That's correct. And the government asked for that instruction, and that's what this Court's case is, that they rely on Halloran, Zerr, Chestman, there are many others. You don't have any quarrel with Judge Gariffas' jury's instructions, do you? Our quarrel is that the jury should never have been presented with the question, because the contract expressly disclaims not just a straight fiduciary duty, an agency, any advisory, any relationship of trust and confidence, and I submit that if this Court affirms this conviction, it will just turn upside down commercial, sophisticated counterparties that acting in arm's length ability to set the terms of their relationship. Cairn had every opportunity to try to put additional terms in the contract that governed the execution. It didn't ask for these terms. Do you agree? I just want to make sure that the lines are clearly marked. So, your principal argument, at least with respect to this issue, is that there was no evidence of domination and control in connection with giving rise to a fiduciary duty. And part of that argument, as I understand it, is that there was a contract, the specific letter here, the mandate letter, and the ISSA agreement and so on, that disclaim any fiduciary duty. But you agree that there might be some circumstances, for example, in connection with retail customers, where one sophisticated party has the requisite domination and control of the stock, for example, and the fact that they disclaim in a written contract any fiduciary duty doesn't absolve or eliminate the fiduciary duty. Do you agree with that? I do. And, Your Honor, I think there are two important distinctions. So there are some circumstances where you can have an agreement and that does not, that disclaims all sorts of different things, that does not absolve the counterparty of a fiduciary responsibility. Well, I think I would say two things with respect to the hypothetical situation you were describing. Number one, you mentioned a retail customer. That's a totally different scenario. There are regulations, there are rules in place that govern those. That's not what this was. Number two, this isn't a securities transaction. It's not a regulated commodities transaction. There are no rules that prohibited any of this. Now, the other thing I want to mention is with respect to the whole… Has this, excuse me, since you said that, has this same approach been applied? I believe it has occasionally, outside of a straight securities market. It hasn't been applied in a foreign exchange. We haven't seen that, but it has been applied outside of the securities, hasn't it? There are cases, and we don't contest that those cases are fine, that there's I think four or five cases that have a similar theory. They're completely different. Not a single one involves a contract between arm's length counterparties. I understand that, but in the middle of the argument about the contract that you were You said this isn't a securities transaction, and therefore, and it's that and therefore that I don't quite see, because the fact that it isn't a securities transaction doesn't conclude the matter. You may be right on the basis of a contract, but the fact that this is not a securities transaction doesn't necessarily mean that the same rules shouldn't apply. It has not been applied in a foreign exchange, but as you said, it has been applied in four or five cases, which are different from this one, but are not your straight securities governed SEC rules, right? That is correct, Your Honor, but they're different in material ways. I understand that. I just wanted to correct something that you seem to be saying in answer to a different question, which you can go back and answer. That's right. Just one other point in that regard. My point really is that one has to take account of the background regulatory framework, because this is a criminal case. Is this a due process argument? I was about to get to that, Your Honor. It's a due process argument, but it fundamentally undergirds much of what you're saying. That's correct, Your Honor, and let me see if I can pin it down to really what I think is the worst thing about this. The whole premise of this case is that somehow there's a quantity of pressure on the fix that one can measure, and there can be just enough or too much, or some can be unnecessary, and I respectfully submit, once you go down that path, it's impossible for anyone to know where the line is drawn. It's completely unassertainable. If the question is simply how much money did they make or how much money did they not make, then you're absolutely right. It cannot be a question of did they make more money or less or something of that sort. The question has to be whether within this contract, your clients knew that they were violating what was required, and then whether they made a little bit of money or a lot of money doesn't make any difference. The question is, when they said something, let's do this, but let's not do too much, because then they'll complain, were they speaking about knowing that they were doing something which violated what this was about or not, and is that enough for a jury to find, which I don't know. Well, first of all, I don't agree with the premise of your question, but even if we assume, and I assume what your Honor is referring to is the October 13th call between Mr. Johnson and the Rothschild advisor, even if you interpret that as some sort of a promise, I would say a couple of things. First, it's incredibly nebulous what is meant. And more, the other thing which I wanted to point to earlier with respect to the contract is that the contract, the ISDA incorporated in the mandate letter expressly says that it supersedes any oral representations and it post-dates that conversation. And in the context of this, my point is, everyone understood that HSBC was going to put pressure on the price of the pound, and that was made even more necessary, if you will, because Cairn did not give the two hours' notice that HSBC had tried to, had demanded, actually. And that's part of the agreement. And it's part of the agreement. And they did the transaction anyway, and everybody knew this was going to pressure the price of the fix. And Mr. Johnson... Sorry. I'm sorry. So if this were so, if this were all above board, why are all the kind of misleading statements and the Russians are the ones that did it, why did all that happen? I mean, that has kind of the hallmark of somebody who thinks they were doing something they shouldn't have done. I mean, that's part of the transaction. When HSBC, when Cairn asked about it, they said, oh, well, that was the Russians. Well, they, you know, we dispute that Mr., there was no evidence that Mr. Johnson knew that wasn't true. But in any event, even accepting it as you stated it, you know, first of all, it's not material. And if, you know, there had to have been a crime in the first place, right? And it may well be that they felt... What it shows is, look, and you're going to quibble with this, but what it, what at least it gives the government an argument that there was evidence of consciousness of guilt. Well... But what you're saying is that the underlying premise is wrong. It's not, it's the underlying premise is wrong. And indeed, it may well be that they didn't know they were going to make as much money and they felt a little sheepish about it and they want, they wanted to have a continuing relationship with this company. And so, you know, so, so that's what's going on there. And, and indeed, this court has in, in many other cases where like, that's all you have rejected it. And in the Finnerty case, which we cite, for example. What about that squealing comment? You know, they wanted to make sure that they didn't ramp it up too high or, or Karen would squeal. Well, the context of that conversation actually is that Mr. Johnson is asking Mr. Scott, the short sum. We have enough pounds. Don't worry about it if you have to buy some after the fix. That's what he says. Twice. Not once, but twice. And, and so you can say, you know, squeal, gee, that sounds like a bad word. But in context, and particularly in context of the you can afford to go short, what it actually shows is that Mr. Johnson was trying to make sure, telling them to ease off a bit. And the other thing that I would, I would say is that you can't forget that Mr. Cahill, the one who was doing most of the great trading, testified not only that he never spoke to Mr. Johnson, but that he traded this fix the way he does any other fix and that this is the way you do it. And then he combined some aggressive techniques also with some other techniques to ease the price called an iceberg. So the premise of this is that there was a promise, which there wasn't. And if there was, it was superseded by the written contract, which contained no such promise, which Karen could have asked for, but didn't. And then let me ask you just a question, but you can feel free to go on without my question. Sorry. No, no. If there was evidence of a direct lie by Mr. Johnson to the Karen representative, Jarrelson or whoever Jarrelson, whoever it is, what would we make or what could a jury make of that? Notwithstanding all of the agreements, notwithstanding the ISDA agreement, the, and the other agreements. I think that, and obviously that's not a direct material lie. If there was a direct material lie of fact, for example, um, before the transaction got executed, then maybe there'd be a fraud. It would depend what it was about. There's wire fraud and mail fraud. I mean, there's, these are capacious. Sure. And, and, and just to be clear, our argument doesn't at all foreclose fraud cases in, in where there's a contract. It's just that on the particular facts of this case, the basis for the fraud is this claim of breach of duty or breach of an oral promise that was superseded by a contract. And that itself is completely a slippery slope or a slippery ramp, if you will. Now, I'd like you to explain to me if we decided your way, what it is that banks dealing in this situation can feel free that they can do without violating the law, even when there is some kind of agreement on doing one kind of deal rather than another kind of deal of doing a, uh, uh, a, a deal that does not in foresee ramping in as against the deal with the fix. That is, assume we decide your way. What is it that we come out afterwards? The others, you know, via me, so I say how dangerous it is because it opens up any number of things, uh, to which the answer is, but not if there is a specific lie. I'd like to know what the other side is, what it is that you're seeing is okay in these, uh, situations, which are very similar to things, which in securities context, we hold to be crimes all the time. I'm sorry, Your Honor. I'm not sure I understand the question, but if you don't understand, I mean, I think, um, I guess what I, what I would say is this, this is a very, very unusual case, um, in a number of ways. One way is that, um, we're dealing with, um, with a, a type of transaction. Size of the transaction. It's a giant transaction, but also it's a type of transaction, um, in a market that's not regulated where the rules are basically set by the contract. And this fixed trading is a very, you know, kind of, um, risky thing on both sides. I think that Judge Calabresi is trying to get at, because it, it animates a concern that I've got. Let's say that we rule your way. Are we, are we signing off on the wild, wild West? Absolutely not, Your Honor. And this, why, why not? What, what are the limitations? Because what the limitations are, number one, um, the, the transaction, like any normal commercial transaction between arm's length counterparties, is governed by the terms those counterparties who are big boys got bargained for. That's number one. Number two, if somebody in the course of, of, of, um, conducting the bargain were to tell a material lie of fact, that might be a fraud depending on, you know, what it was or how it impacted things. Um, but, uh, I don't think you're opening up anything because, and I think the fact that there are so few cases and not a single one like this illustrates the point. There isn't a single case, misappropriation, um, case or any other where you have arm's length counterparties expressly disclaiming fiduciary advisory agency, anything of fidu, trust and confidence within the meaning of the case law, expressly disclaimed multiple times. There's no case like that. We've kept you well, well past your time. Uh, and I appreciate it. There are some lawyers behind you who are sweating, uh, but we'll hear from Ms. Elbert. Thank you, Your Honor. May it please the court. My name is Lauren Elbert and I represent the United States. Mark Johnson's conviction is valid under either theory of viability presented to the jury in this case. All of the factual issues that Ms. Shapiro is trying to relitigate before this court were presented to the jury and the jury accepted the government's theories. So, so with respect to the misappropriation theory, you rely or the government, uh, relies largely on this nondisclosure agreement. Is that correct? That's correct. Your Honor, in order to establish the duty element that's necessary for the misappropriation theory, we have, first of all, the nondisclosure agreement expressly accepted by HSBC. In that agreement, um, HSBC agreed to keep Karen's information confidential, to share it only with employees at HSBC who were strictly necessary to work on the deal. Um, and only to use that information for the purposes prescribed in the deal. That agreement had a period of two years expressed in the agreement. Nobody testified that they understood that agreement to relate only to the RFP process or that it somehow was testified actually to, uh, to the opposite. That's correct. Duncan Holland and Mr. Scriven from Karen at, uh, government appendix three, five, 12, 53 and 54, as well as Mr. Coat from HSBC government appendix 27, all testified that they viewed the confidentiality agreement as being enforced. Evidence is there on the misappropriation theory that Mr. Cairns was injured, uh, on the control theory on the ramping in. I, I see enough evidence, but on the trading theory, uh, I have trouble with that. Now you make the argument that if a theory is a valid theory, then the jury, then even if there isn't sufficiency of the evidence under Supreme court holdings, uh, that is enough to find a conviction. I find that theory appalling, but I must admit that the Supreme court seems to have said that, uh, but, uh, just as of interest, uh, what is the evidence of harm that you, or do you have evidence of harm under the misappropriation theory? I think there are two ways to look at harm on the misappropriation theory. The first is that Karen's confidential information is its own property. That's what it said in the nondisclosure agreement. That's what HSBC agreed to. That property is in and of itself valuable and HSBC misappropriated it. That's one extent to which it harmed them. Second, you can't decouple the advance trading from the expectation to profit at Karen's expense in connection with the ultimate transaction. That was their motive for placing the front running trades in the first place. But wasn't that part of the agreement that that's how HSBC was going to make its money on the difference? I mean, didn't they discuss precisely that? They did discuss the possibility that HSBC would be able to make money on the difference if HSBC could beat the fix. There's no guarantee HSBC would beat the fix. Uh, it's a risky proposition. They could make money, they could lose money, but Karen certainly understood that HSBC would try to beat the fix and that there would likely be some uptick in volume, some uptick in the exchange rate by virtue of the volume of the transaction. However, I'm sorry. Yeah, no, I just have a slightly different opposing party has talked a great deal about these being two grownups dealing with each other and making a particular contract. All that sounds very interesting, but this isn't a civil case. This is not a case of a suit about one grownup party suing the other for damages and so on. It's a criminal case that the government has brought, and I'm kind of interested in what is the government's interest in bringing, making this kind of situation like the ones under securities, which they bring criminal cases in all the time. I mean, what is interesting about this case is that the government is expanding a way of looking at some transactions in one area and applying it to a quite different area. And I'd like to know why, what the government, I mean, you know, this is a criminal case. It's not a matter of whoever two parties are arguing with each other. What's the government's interest? I mean, from a policy perspective, I think, you know, one of the key things to keep in mind about this case, and I think some of Judge Loya's questions went to this fact, all of this conduct arises in a cloud of deception. It's not as though there were just these front running trades. There are multiple misrepresentations that Mark Johnson and his co-conspirators make directly to their client regarding how this trade is going to be conducted. So setting aside any novel application of theory, at the end of the day, we have lies for money, well in the wheelhouse of what the government typically prosecutes. Secondarily, while the FX market is not regulated to the same extent as the securities market, it is still a market in which the public participates. It's a market where the government should have a role in preventing fraud. And I want to, I want you to go back to Judge Calabresi's question, but when you say that it's not regulated nearly to the extent, is there any civil regulatory enforcement interests in this case? I mean, I can't answer, you know, to what extent the CFTC. Well, you would know, wouldn't you? You're the prosecutor. I'm. In any civil regulatory interest in this case. There has not been any civil regulatory action taken by the CFTC in connection with this case. There has been a civil case brought by the victim and the Justice Department brought its own case. Presumably, the victim came to the government and said, this is what happened. That's how it started. So, um, so set that. So now I want you to focus back, I think, on, uh, whatever lies that seems to be, uh, the avenue. Yes. On under both theories. So there's multiple lies told in connection with this case. I think the starkest is from government exhibit 193, which is in the appendix at 389 to 390. This is where Mark Johnson has a call with Francois Jerison. Um, prior to the transaction, Mr. Jerison is asking him whether in the event HSBC does beat the fix, whether HSBC will do some profit sharing. And Mark Johnson, in response to that question, makes several misrepresentations about how this deal is going to be done. Yes. Uh, he suggests that if a bank is offering a discount, the bank is doing it because they're intending to ramp. He's horrified when he sees banks do this because it's just so obvious that they're intending to ramp the fix. Now I understand Ms. Shapiro's argument that that's not Mark Johnson saying, I promise I will not ramp the fix, but the unmistakable implication of that is that HSBC is going to do its business differently and that's why they won't offer a discount. He says to Mr. Jerison, we're giving away some control on the fix. We just try to average that fix. Plus a few pips for our account that is strongly contrasting with what HSBC ultimately went, went on to do. Second, we have a government exhibit, uh, 124, uh, which I don't have an appendix site for, it's a call from November 28th. This is a call between Stuart Scott, just, I'm sorry, I want you to hold that. Sure. Uh, what is the government's view or what was the evidence of when the ramp up began? When the, the ramping began in terms of the increase of the price. So, uh, Mr. Johnson and deliberate ramp. Yeah, sure. Mr. Johnson and other traders at HSBC. Um, Mr. Johnson places trades, you know, days earlier, other traders at HSBC start to place trades around approximately 1 30 PM that afternoon. Um, the order comes in at two. That's when Mr. Cahill, who is the one actually, correct. Who is the one actually executing the trade starts to buy up pounds. However, if you look at, and I can give you a site for this in a moment, if you'd like it, there's a chart that the government's expert prepared that shows the timing of the trades, um, and it's, uh, keyed to the rise in the exchange rate. This is Mr. Waller. Um, and in that exhibit, uh, it shows, uh, the sharp uptick starting approximately 10 minutes before three, and then going, you know, basically vertical, approximately two minutes before three. And this is that appendix, uh, three 99. And there was testimony in the record from Mr. Waller as well regarding, um, the fact that Mr. Cahill, uh, purchased about 1.2, uh, million pounds. So, you know, close to half within the two minutes prior to the fix. So the, the, I think that Ms. Shapiro's problem with this is that the contract contemplated a, uh, uh, a two hour window, uh, the request or the demand comes in 30 minutes before that 3 PM fix, 1.30 is sort of within that, roughly that, um, two hour window. And there's, they just start to ramp up because they anticipate the request is coming in, but it hasn't yet come in. Why isn't that a, and maybe these are issues of fact again. The reason, the reason why, um, that's really, uh, not relevant is that you can look behind the curtain and see what Mr. Johnson and his co-conspirators are saying. When they get in the order late, they get it in, you know, with less than two hours to spare. The reaction isn't, oh no, we can't pull this off. It's going to cause this big uptick in price and the client's going to be hurt. The exact opposite. Mr. Johnson talks to Stuart Scott and says effing Christmas. This is going to be, you know, in effect saying this is going to be a great trading day for us. We're going to make so much money because we're going to be able to ramp that fix right up. I mean, this is, it's just not, it's just contrary to fact to suggest that HSBC had to ramp the fix by virtue of the fact of having late notice. They in fact were thrilled to learn that they had the full amount, the full $2.5 billion in time to ramp that price. What do you say to, um, counsel's argument that, um, because a case like this has never been prosecuted, uh, her client was essentially denied due process because you proceeded on this theory. We obviously disagree with that. Um, I think as I was saying, as I was saying earlier, um, you know, understanding that there's not a case exactly on these facts in the FX market. Every case is different. This jury was correctly instructed that the wire fraud statute is intentionally broad. It's designed to capture any means of deception that human ingenuity can devise. And the fact that it's the FX market versus the stock market really isn't a material difference. So long as you have lies and deception perpetrated upon somebody in exchange for their money or property. So you say that though Mr. Johnson, if you win, goes to jail, he really has no complaint because you know, we're sending, we would be sending somebody to jail for doing something, which opposing counsel argues very powerfully, this fellow had no reason to think was any kind of wrong and you've got to convince us that somehow that is not a problem. I think the record belies the inference that Mr. Johnson had no idea what he was doing was not wrong. When Mr. Johnson is tipping the other HSB traders, the ones who are on the other side of the information wall, he uses code words. He says, I left my watch at the hotel in order to signal that the trade is imminent. Everyone on those conversations seems to know what he's referring to. He doesn't say we're doing Karen's fix at 3 PM, help us out with the trade, which is what you would expect to hear if the facts aligned with the, with defense counsel's representation. We have the fact that after the trade goes down, he tells the client, he and his co-conspirator, Stuart Scott, tell the client it was the Russian bank who was at fault for the uptick in price, knowing full well, that's not true. Here's a slight problem that I've got because you were going to go take us through this, uh, the series of lies and I appreciate that, but for whatever reason, um, reasons that I really don't understand, uh, the government, I take it asked for a jury instruction relating to the misappropriation theory, uh, and that jury instruction instructed the jury that they, um, in order to, to, to convict based on that theory had to control and dominance, right? So you're stuck with that with respect to that theory. Would you agree with that? Yes. Okay. Help me out where in this more or less arms length transaction, understanding that, you know, the folks from Edinburgh may not have a full understanding of the FX market. Where is the control and dominance? So I would not accept the proposition that this transaction was fully arms length. To the contrary, HSBC was selected by Karen at the end of a nine bank competitive bidding process. Karen went out to solicit advice from their various relationship banks about how to best execute the deal. In response to that request, HSBC supplies the PowerPoint presentation saying that they will trade in Karen's best interest, that they're going to try to minimize adverse market movement. Um, Karen, uh, selects HSBC as their bank to conduct this transaction. Then Mr. Johnson has multiple conversations with the client where he's giving advice on how to conduct the transaction. Speaks with Francois Jarrison at length about the various options, about how it works. Mr. Jarrison is not an FX expert. I think he seems to know what he's talking about when you read the transcript of those conversations. He's a banker. No doubt. It's familiar with the general outlines of these types of transactions, but it's also clear from the conversations that Mr. Johnson is significantly more sophisticated. And in effect, what we have here is really on all fours with the way that the, I'm probably going to botch this pronunciation, but the Milovanovic case discusses duty, where we have, you know, even accepting the proposition that the contract is claimed a formalistic fiduciary duty. We have a trusting relationship where Karen understood HSBC would be acting for its benefit. And where HSBC induced Karen to relax the care and vigilance it would ordinarily exercise. Karen's completely at HSBC's mercy. Once they tell them the time that they're going to do this transaction and select the mechanism. Under what circumstances would a relatively sophisticated, but less sophisticated party than the counterparty not then, uh, be able to, uh, take advantage of this control and dominance theory? I mean, I, you know, look, there are, when we talk about an arm's length transaction, when we talk about, uh, sophisticated parties, some parties will be, um, more sophisticated than the counterparty in every, in every case, right? So someone's going to make money, uh, uh, and someone may not make as much money or may even lose money. But that doesn't mean, I think, based on our case law that they have the that leads to fiduciary duty. So help me out, demarcate that line for me. I think the difference is, so for example, the government's expert, Dr. DeRosa, gave an outline of the basic way that an FX transaction operates at an elemental level, which is you call up the dealer and you ask for a quote on a certain amount of money. You don't say whether you're buying or selling because you don't want the dealer to know, because they're going to be incentivized to move, you know, give you a price that's to your disadvantage. Right? So, um, in this case, it's different. Instead of giving, you know, asking for a blind quote, Karen selects HSBC to represent it and advise it in connection with this transaction, relies on the advice that Mr. Johnson gives them about, for example, the time to execute the trade. Mr. Johnson suggests they do the 3 p.m. fix because there will be less people messing around in the markets, potentially moving the exchange rate to their disadvantage. They, they rely on that advice and they rely on HSBC's representations that they're going to not seek to move the exchange rate unduly against them. And that they're going to ask in their best interest, act in their best interest. And that's what they understood the transaction to be about. And they negotiated a nondisclosure agreement with HSBC that provided that their information would be very short. Your argument is that there was a deal that these people, that Mr. Johnson and HSBC would not try to raise the price that they would go and buy, but that they would not intentionally try to raise the price. And instead that there is enough evidence on which a jury could find that they instead, in violation of that agreement, intentionally raised the price. And that is the essence of your control theory. Is that correct? Correct, Your Honor. Okay. Um, that's interesting question. Well, that's premised on a lie. Correct. Series of lies. And you were going to get to your second, second. Yes, I can get to my, my second series of lies very quickly. I see that my, my time is up, but, um, I'll refer the court to government exhibit one 24, uh, which is a call between Stuart Scott and the client in which Mr. Johnson participates. Stuart Scott, um, tells the client that, uh, it, it, HSBC, when they do trades at the fix, they like to do 11 o'clock. That's what they do for themselves. Therefore, that would, they would advise, that's what they would advise. Again, representing to the client that they're going to execute this transaction in a way that they would do it for themselves. I have government exhibit one five zero, which is, um, at the appendix three 22 to three 24, this is a call during the day of the transaction where Mr. Johnson is suggesting that the client, um, execute the deal at the 3 PM fix. First of all, Mr. Johnson says, if we start accumulating pounds, people will assume you're looking for the 4 PM fix. At that time, a number of other traders at HSBC had already started trading on Karen's information. Also suggests that there's an element of surprise. There's less people kind of messing. This is the day of the, uh, the actual transaction. Correct. Less people messing around, again, giving the representation that they're concerned that other parties in the market are going to try to move the exchange rate against Karen knowing full well that was their intention. And then we have the call, um, after the deal is concluded, uh, where they, Mr. Scott and Mr. Johnson are on the phone with the client and make false representations as to the time they started buying, claiming that they started trading at 10 to three when they started significantly earlier. And then these are all material transactions, material misrepresentations, because at that point they could have said no. Well, there's two reasons why these trends, these, the post trade representations still count. First is that under this court's precedent, they will qualify as their statements designed to cover up the earlier misconduct and delay, uh, themselves being reported to the authorities. And second, it's a spot transaction, which settles in two days. It seems to me possible that if Karen were able to show that they had been defrauded prior to settlement, they would have had a good argument to be let out of that contract. Um, and so in addition, during that call is when they make the claim that the, um, responsibility for the price ramping relies, uh, was the result of the Russian central bank, uh, buying pounds at the same time, which was not, not accurate. And, you know, Ms. Shapiro stated that there's no evidence that Mr. Johnson knew that convert, that comment wasn't true. And that's again, belied by the record. If you look at government exhibit 168 at appendix 338, you have the call between Mr. Johnson and Ed Carmichael, another banker at HSBC, in which Mr. Johnson is recapping the trade. It's all very jocular. Everyone's laughing. And he says, you know, so we told them that it was, you know, all the usual stuff, you know, Russian banks, central banks, whatever, clearly indicating that that wasn't actually what happened. Thank you very much. Thank you very much. Ms. Shapiro. Your honor, I have far too many points to make, but let me just make a few. Number one, um, the alleged victim in this case never complained to the department of justice. What happened was, uh, five years after the transaction, for reasons we don't know why, I think the government was conducting some other investigation. They arrested Mr. Johnson and it was only after he was arrested that Karen filed a lawsuit in Britain. That is absolute fact. Um, number one, number two, all of this discussion about HSBC as advisor is complete bunk. The advisor was Rothschild. They were retained to advise Karen with regard to the entire transaction, including the foreign exchange. And there are numerous, numerous disclaimers throughout the relationship of any advisory relationship, starting with the pitch deck, which has three different points where it makes that clear. And then continuing. So the, uh, I think that the crux of the argument, at least in my view, and based on, uh, Ms. Ms. Albert's, um, presentation is that there were a series of material misrepresentations made. And that seems to wipe away a lot of the issues if he lied. And I think this is what you, um, acknowledge if he lied repeatedly to, uh, people at Karen to Jerison, to whoever in connection with this transaction, uh, why isn't that a, uh, appropriate theory? Because he didn't the fact they're misrepresenting the facts. There's a call where they say, can I, excuse me? Are you saying that there are not enough facts on the basis of which a jury could find that he lied? Yes. Or are, is that what you're saying? We're saying a number of things. Yeah. No, just, I, I've got to, because when you say these are not the facts, I have problem in a case that has gone to a jury. I want to know is, is essentially your argument and insufficiency of the evidence so that a jury could find these lies? Or are you saying that these cannot be lies, even if there is this evidence, which of these two are you saying? And so just to give one example, Ms. For the first time that it was, and I believe it was Mr. Scott who said these things, but that it was somehow false to say that HSBC usually prefers the 11 a.m. fix. That was true. The reason the 11 a.m. fix wasn't used was because Karen didn't get the money until after 11 a.m. And then it chose the three o'clock fix rather than the four o'clock for its own reasons. How much of all this is simply a jury argument? You know, I have, let me be quite blank, quite honest. If I were on a jury, I would find myself very sympathetic to you. On the other hand, I am not a jury and that's what I want to try to figure out. Okay. So let me say two things. First of all, we have arguments that we think are essentially purely legal, which are based on the contract and the lack of any fiduciary duty. And those could be sufficient to throw out the entire conviction. We also have factual insufficiency. Not, I think if he engaged in a series of lies, who cares what the contracts, that's the, and that is the fundamental theory of this case. Now you may have an issue with respect to the, whether a relationship of trust and confidence exists, um, particularly given the, uh, jury instruction. But if it is a series of lies by Mr. Johnson to anyone associated with Karen about this transaction, and it leads Karen to enter into this transaction with HSBC, why isn't that wire fraud? Why isn't that some type of federally prohibited fraud? I think I would urge the court to read both the LitVac I case from 2015 and the LitVac II case from 2018, which are cited in the papers. Um, in that those cases, and, um, there's an extensive discussion of what is material in the context of a relationship like this. And the court is quite clear in both opinions that, um, if it's an arms length counterparty relationship, that, um, it's rare that these, this kind of discussion would be material, even if, and, and in fact, there's concealment on both sides in this case, in this very case, there's evidence that, in that case, there was, you know, part of the, part of the alleged misrepresentation was, uh, what LitVac knew about his side of the, uh, of, of the, um, aisle, so to speak. Here we have direct misrepresentations about the central transaction or alleged misrepresentation. No, Your Honor. How's this, how's this, this is different from LitVac. I think this is far less, um, the facts are far better for us than LitVac when you're talking about deceit. In LitVac, there's tons of lies and it's not material because of the nature of the relationship. There aren't tons of lies. Their primary claim of any misrepresentation that supposedly occurred before the transaction is they claim that there was a promise not to ramp, number one. That's, um, as I've, I've already explained why that is not any kind of a legal basis on which to bring a fraud claim in the context here where there was a bargain and the other side had ample opportunity to put it into the bargain. Um, this is a fixed transaction. Um, and, and everybody knew that, and, and indeed, and this is another point that I wanted to make, the government's experts could not articulate a better way to do this. One of them had no answer when asked repeatedly that question. The other one hemmed and hawed and then said, well, they should have bought all the pounds afterwards, which is commercially unreasonable and outrageous given the enormous risk. I don't disagree that when the government is relying on experts, it's not a good idea. To put that another way, what we are talking about here is a situation where the government has no articulated way this should have been done. And yet they want to send him to prison for doing it some way they don't like. That's what this is about. And could I make one more point? Your Honor, I just want to, just to put a pin on that due process point. We have not only numerous recent decisions, the United States Supreme Court narrowly construing the mail and wire fraud statutes, McDonald's, killing others in the last 20 years, McNally long before that. And in this court, we have the Brennan case from 1999 by Judge LaValle, in which he makes clear at the end that it is highly troubling. In that case, it was an insurance company issue that the government was taking the position that in an arm's length counterparty situation, just like this one with sophisticated people on both sides, that there could be a wire fraud for, for that conduct, which was, you know, in a different industry. But thank you very much. We'll reserve decision. We'll hear argument next in Avila. Very well argued by both sides in a not easy case.